[Cite as *State ex rel. Parker v. Indus. Comm.*, 2014-Ohio-2193.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Art Parker, | : | |
| Relator, | : | |
| v. | : | No. 13AP-583 |
| Industrial Commission of Ohio and Prenova Inc., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on May 22, 2014

*Portman & Foley LLP,* and *Frederic A. Portman*, for relator.

*Michael DeWine*, Attorney General, and *Brian J. Becker*, for respondent Industrial Commission of Ohio.

IN MANDAMUS

BROWN, J.

{¶ 1} Relator, Art Parker, has filed an original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio, to vacate its order of June 3, 2013, denying relator's application for permanent total disability compensation, and to enter an order granting said compensation.

{¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53(C) and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the appended decision, including findings of fact and conclusions of law, recommending that

this court deny relator's request for a writ of mandamus. No objections have been filed to that decision.

{¶ 3} Finding no error of law or other defect on the face of the magistrate's decision, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law. In accordance with the magistrate's decision, we deny relator's requested writ of mandamus.

*Writ of mandamus denied.*

O'GRADY and LUPER SCHUSTER, JJ., concur.

_____

# APPENDIX A

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Art Parker, | : | |
| Relator, | : | |
| v. | : | No. 13AP-583 |
| Industrial Commission of Ohio and Prenova Inc., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

_____

## MAGISTRATE'S DECISION

Rendered on February 28, 2014

---

*Portman & Foley LLP,* and *Frederic A. Portman*, for relator.

*Michael DeWine*, Attorney General, and *Brian J. Becker*, for respondent Industrial Commission of Ohio.

---

IN MANDAMUS

{¶ 4}   In this original action, relator, Art Parker, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the June 3, 2013 order of its staff hearing officer ("SHO") that denies relator's January 16, 2013 application for permanent total disability ("PTD") compensation, and to enter an order granting the compensation.

Findings of Fact:

{¶ 5}   1.  On June 19, 2000, relator injured his lower back when he lost his balance walking down stairs.  On the date of injury, relator was employed as a carpenter for respondent Prenova Inc., a state-fund employer.  The industrial claim (No. 00-432275) is allowed for:

> Sprain lumbar region; aggravation of pre-existing degenerative joint disease at L-5, S1 (facet arthropathy); aggravation of pre-existing disc protrusion at L2-L3, L3-4 and L5-S1; L4-5 annular rent; aggravation pre-existing disc bulge L4-5; L4-5 protruding disc.

{¶ 6}   2.  On December 29, 2009, relator underwent lower back surgery performed by Larry Todd, D.O.  In his operative report, Dr. Todd describes the surgical procedures performed:

> [One] Posterior spinal fusion and instrumentation at the L4-5 and L5-S1 level utilizing Stryker Xia II instrumentation.
>
> [Two] Infuse bone morphogenic protein for the posterior fusion part of the procedure at the L4-5 and L5-S1 level.
>
> 3.  On November 9, 2011, treating physician Stephen Altic, D.O., wrote:

> [H]is condition is stable and not much else is able to be done in his case and I feel that he is [maximum medical improvement]. Since I have now stated that he is permanently totally disabled, I am obviously unable to continue stating that he is temporarily disabled on a C-84.

{¶ 7} 4. On November 9, 2011, relator filed an application for PTD compensation. In support, relator submitted the November 9, 2011 report of Dr. Altic

{¶ 8} 5. On January 12, 2012, at the commission's request, relator was examined by Robin G. Stanko, M.D. In his three-page narrative report, Dr. Stanko opined:

> I feel the claimant could perform activity at sedentary work levels, that is, lifting up to 10 lbs. with rare bending and twisting activity.

{¶ 9} 6. On January 12, 2012, Dr. Stanko completed a Physical Strength Rating form. On the form, Dr. Stanko indicated by his mark that relator is capable of sedentary work.

{¶ 10} 7. On March 8, 2012, at relator's request, vocational consultant Stephen Phillips, an employee of Medvopro, issued a six-page narrative report captioned "Employability Assessment." In his report, Mr. Phillips concludes that relator is unable to perform sustained remunerative employment. Mr. Phillips explains:

> He reports constant pain in his lower back with numbness and weakness in both legs as well as radiculopathy down the right lower extremity. His physical limitations have caused him to do his ADL's at a slower rate. He has to stop and rest. He requires assistance from his daughters. He can only engage in an activity for a few minutes and then must rest for a long period of time. He can drive but only for short distances. He has to change positions every two hours.

> He is in chronic severe pain for which he takes narcotic medication. This limits his ability to drive to a place of employment and then engage in work around machinery or other activities where an altered state of consciousness can be a safety hazard for themselves or others. Driving is also difficult and aggravates his conditions. The medication will also adversely affect cognitive abilities such as problem solving, focus, attention to detail, and memory. These are also accentuated by sleep depravation due to being awake a lot at night due to pain. Lack of restorative sleep places an

individual at risk due to a slower reaction time, ability to concentrate on tasks, and to exercise good judgment in situations.

His work history is limited to building maintenance repair which is a medium strength range job in the skilled level. He has done this work all his life successfully until the date of injury. The injury drastically changed his physical abilities. Thus, the positive attributes such as past academic skills, intelligence, work history, ability to learn, consistent work history, past learned skills, which served in attaining this career are now inhibited by the changed circumstances. Success in the past based on positive attributes can no longer be a predictor of current status. They are only an indicator of what worked in the past when he was healthy. As he is no longer at the same physical functioning level, he must be evaluated according to his current status and not his past status. There is no evidence that his education provides for direct entry into skilled work. There are no jobs existing in significant numbers in the national economy that he is able to perform.

* * *

He does not have the capacity to perform writing or business correspondence or complex decision making. He presents as having marked limitations in his ability to do complex tasks and participate in normal work routine because of his physical difficulties. He cannot perform within the usual and customary expectations of a normal work routine; he would be unable to maintain a consistent pace or to be persistent in a work like task. His condition precludes his ability to attend and concentrate or to be productive enough to complete a normal work routine or to perform at a level commensurate with production or quota demands.

At the age of 61 he is at a disadvantage in seeking employment in this day of high unemployment and against younger able bodied individuals competing for the limited jobs available, especially in any low strength jobs. Age discrimination does exist as well as prejudice against disabled or physically limited individuals. This creates an additional barrier to employment.

The report by Dr. Robin Stanko MD opining ability to work in a sedentary capacity when compared to other available documentation does not present a credible conclusion. The

weight of evidence leads to a conclusion of his inability to sustain remunerative employment.

Per MCO medical management guidelines, an injured worker is to be periodically evaluated for vocational rehabilitation services and then offered such services, unless during the evaluation process, the injured worker is found to be not eligible or feasible for services. Feasibility as defined by the BWC Chapter 4 guidelines states, "feasibility for vocational services means that there is a reasonable probability that the injured worker will benefit from services at this time and return to work as a result of these services." There was no documentation provided that services were offered or turned down or that he was even informed of the availability of possible services. He has not been in vocational rehabilitation in the past and given the facts of the case would be found non-feasible for services by BWC.

Training is not an option even though he has a high school education, at his age o[f] 61, length of time since his last academic experience- 42 years, and lack of information revealing on-going or recent academic studies, individuals normally find academic retraining to be very difficult. When the on-going physical issues and medication issues are considered it makes training even more difficult. From the physical standpoint he would have difficulty attending classes for several hours a day. He is in chronic pain and even with the ability to change position would not be able to endure the physical necessity to attend classes. Depression will also affect motivation and the ability to be self directing and focus on long term goals of schooling. At this age, the BWC is not willing to engage in long term training services and available short term training is above his physical and psychological capacity.

* * *

With consideration given to the information on file, the age, and current physical limitations, it is my opinion based on the information contained in this report that Art Parker is limited in his ability to compete in today's labor market. Art Parker is a very unlikely candidate for any ***sustained, remunerative employment.***

(Emphasis sic.)

{¶ 11} 8. Following a June 4, 2012 hearing, an SHO issued an order denying relator's PTD application. The SHO's order of June 4, 2012 explains:

> The Injured Worker is a 62-year-old male with a high school diploma, with the last two years of his high school experience being spent in vocational school. His work experience consisted of approximately 40 years with the same Employer, working as a carpenter in building maintenance repair. The Staff Hearing Officer finds one active claim relevant to the Injured Worker's pending application for permanent total disability compensation, claim 00-432275, which relates to a 06/19/2000 industrial injury that occurred when he lost his balance while he was descending a flight of stairs and fell. Treatment under the claim has included a major lumbar surgery consisting of an L4-5 and L5-S1 decompressive laminectomy and fusion with cage implantation and bone graft. Current treatment is conservative. The Injured Worker testified that he lives alone, does his own cooking, laundry, and shopping, and tends to livestock on his property. According to his IC-2 Application and his testimony at hearing, the Injured Worker last worked in any capacity in December of 2009, leaving the work force just prior to his lumbar fusion surgery.
>
> Dr. Stanko, a physical medicine and rehabilitation specialist, examined the Injured Worker on 01/12/2012 with regard to the allowed conditions of the claim and the permanent total impairment issue. Based on his examination findings and review of file documentation, Dr. Stanko concluded that the Injured Worker is capable of sedentary work activity, with a limitation against more than rare bending and twisting activity.
>
> Based on the report from Dr. Stanko, which is persuasive, the Staff Hearing Officer finds that when only the impairment arising from the allowed conditions of the claim is considered, the Injured Worker has the residual functional capacity to perform sedentary work activity as described in the report. Furthermore, when his degree of medical impairment is considered in conjunction with his non-medical disability factors, the Staff Hearing Officer finds that the Injured Worker is capable of sustained remunerative employment and is not permanently and totally disabled.
>
> The Staff Hearing Officer finds that while the Injured Worker's age is an impediment to his potential for returning to the workforce, it is not an insurmountable barrier to that

potential. Individuals of the Injured Worker's age have sufficient time to acquire new jobs skills, at least through informal means such as short-term or on-the-job-training, that could serve to enhance their potential for re-employment. In this regard, the Staff Hearing Officer finds that subsequent to his recovery from and stabilization after his 2009 surgery, the Injured Worker has not initiated any contact with the Bureau of Workers' Compensation Rehabilitation Division with regard to his feasibility for vocational rehabilitation services, or made any other effort to re-train or to acquire new skills. As set forth in State ex rel. Speelman v. Indus. Comm., 73 Ohio App.3d 757, 598 N.E.2d 192 (1992), and more recently in State ex rel. Cunningham v. Indus. Comm., 91 Ohio St.3d 261, 744 N.E.2d 711 (2001), the Commission, when considering a claim for permanent total disability, may consider not only past employment skills, but also those skills which may reasonably be developed; accordingly, the Staff Hearing Officer may take into account the lack of effort by an Injured Worker to pursue new skills that might have led to a return to employment.

The Staff Hearing Officer finds that the Injured Worker's high school diploma is a vocational asset with regard to his re-employment potential, despite the following facts. The Injured Worker testified to difficulties in reading and writing due to a diagnosis of dyslexia, indicating that he did not graduate high school until age 20, after pursuing vocational classes in machine drafting in order to finish. He further testified that he never used this vocational training in his work as a carpenter and in building maintenance and repair. On his IC-2 Application, however, the Injured Worker reported no self-limitations with his ability to perform basic math. Notwithstanding his literacy difficulties, the Injured Worker had a long and successful career for one Employer as a carpenter and in building maintenance. The Staff Hearing Officer finds that the added significance of this finding lies in the fact that the Injured Worker's work in this capacity is properly classified at the skilled level of employment, as indicated in the vocational assessment report from Mr. Phillips dated 03/08/2012, submitted on the Injured Worker's behalf. As such, despite his literacy problems, the Injured Worker was able to learn the skills necessary to perform skilled work activity successfully for approximately 40 years, presumably through informal means such as short-term or on-the-job training as opposed to any formal program. The Staff Hearing Officer finds that on his IC-2 Application, the Injured Worker indicated that his work in

carpentry and building maintenance required him to read work orders, close out work orders, and buy orders. Mr. Phillips' report further indicates that throughout his career, the Injured Worker demonstrated average general learning ability, average verbal aptitude, and average numerical aptitude, as well as above-average spatial aptitude, form perception, and manual dexterity. Based on these facts, the Staff Hearing Officer finds that the Injured Worker was able to rise above the limitations caused by his reading/writing difficulties and perform successfully at the skilled level of employment for approximately 40 years. The Staff Hearing Officer finds no persuasive evidence on file to support a finding that the Injured Worker no longer retains his demonstrated capacity to learn work skills through informal means. As such, the Staff Hearing Officer finds that the Injured Worker has sufficient intelligence and aptitudes to obtain and perform jobs consistent with his claim-related functional limitations. In addition, the Staff Hearing Officer specifically rejects that portion of Mr. Phillips' 03/08/2012 vocational assessment report indicating that the Injured Worker developed no skills from his past work that are transferable to jobs at the sedentary level; the specific findings cited above from Mr. Phillips' report regarding his average and above-average aptitudes contradict such an opinion.

Finally, the Staff Hearing Officer finds that the Injured Worker is currently vocationally qualified to obtain and perform jobs at the sedentary level consistent with Dr. Stanko's report. The Staff Hearing Officer bases this finding in part on the Dictionary of Occupational Titles, which identifies positions [and] the requirements of which fall within Dr. Stanko's restrictions and for which the Injured Worker is either qualified or can qualify with minimal training. In addition, the Staff Hearing Officer finds that the Injured Worker retains his demonstrated capacity for job skill acquisition, at least through informal means such as short-term or on-the-job training, an exercise of which could serve to widen the scope of employment options available to him.

Therefore, because the Injured Worker has the residual functional capacity to perform sedentary work activity as described by Dr. Stanko in his 01/12/2012 report when only the impairment arising from the allowed conditions of the claim is considered, because the Injured Worker is qualified by age, skilled work history, and demonstrated capacity for

job skill acquisition to obtain and perform jobs at that level as described, and because he retains the capacity to acquire new skills, at least through informal means, that could serve to enhance his potential for re-employment, the Staff Hearing Officer finds that the Injured Worker is capable of sustained remunerative employment and is not permanently and totally disabled. Accordingly, the IC-2 Application filed 11/09/2011 is denied.

{¶ 12} 9. In early November 2012, relator was referred to a vocational rehabilitation program sponsored by the Ohio Bureau of Workers' Compensation ("bureau").

{¶ 13} 10. On December 24, 2012, vocational rehabilitation case manager Stephen Phillips, signed bureau form RH-21 captioned "Vocational Rehabilitation Closure Report."  The closure report indicated that relator's rehabilitation file was closed on December 19, 2012.  The Stephen Phillips who signed the closure report is the same person who authored the March 8, 2012 report previously mentioned.  In the closure report, Mr. Phillips states:

He had a vocational evaluat[io]n on 12/14/12 which opined, "The vocational evaluation indicates a poor prognosis for successful completion of a vocational rehabilitation plan ending in job placement. He cannot do SE/SJ or SE/DJ as he does not have a job to return to. He cannot do DE/SJ as the POR has opined that he is not capable of performing the required job duties. He does not have transferable skills within the sedentary to light strength range. He is not able to sustain an 8 hour day of work based on the performance during the assessment. He does possess a high school diploma and does not have any computer training. However, based on the achievement scores in reading and math, he does not have the academic abilities to benefit from training. He is a very slow reader and reports someone told him he is dyslexic. He does not have the skills for clerical work. He would be too slow in production work and he had low dexterity scores. All his aptitude scores were low and he evidenced no ability in any of them to indicate possible success in a job field. He is [i]n chronic pain for which he takes narcotic medication. He is not a feasible candidate for vocational rehabilitation services leading to employment." He graduated from High School in 1970 though he did repeat two years. He was not in the military. He is in chronic severe pain for which he takes narcotic medication. This limits his

ability to drive to a place of employment and then engage in work around machinery or other activities where an altered state of consciousness can be a safety hazard for themselves or others. Driving is also difficult and aggravates his conditions. The medication will also adversely affect cognitive abilities such as problem solving, focus, attention to detail, and memory. These are also accentuated by sleep deprivation due to being awake a lot at night due to pain. Lack of restorative sleep places an individual at risk due to a slower reaction time, ability to concentrate on tasks, and to exercise good judgment in situations. His work history is limited to building repairer. He has done this work all his life successfully until the date of injury. * * * Training is not an option. At his age, length of time since his last academic experience, and lack of information revealing on-going or recent academic studies, individuals normally find academic retraining to be very difficult. When the on-going physical issues and medication issues are considered it makes training even more difficult. From the physical standpoint he would have difficulty attending classes for several hours a day. He is in chronic pain and even with the ability to change position would not be able to endure the physical necessity to attend classes. It will also affect motivation and the ability to be self-directing and focus on long term goals of schooling. At this age, the BWC is not willing to engage in long term training services and available short term training is above his physical and psychological capacity. He is at maximum medical improvement. Thus no significant improvement can be expected which will alter his employability potential. The MCO agrees that he is not appropriate or feasible for vocational rehabilitation. Feasibility as defined by the BWC Chapter 4 guidelines states, "feasibility for vocational services means that there is a reasonable probability that the injured worker will benefit from services at this time and return to work as a result of these services." In short he can not obtain and sustain remunerative employment to which this case manager agrees.

{¶ 14} 11. On December 24, 2012, Mr. Phillips, acting as disability manager for WorkReady Ltd., wrote to relator:

Please allow this letter to provide formal notification that your vocational rehabilitation file has been closed on 12/19/12 for the following reason: you are not feasible for vocational rehabilitation services leading to employment. You were referred to WorkRead[y] Ltd. in an effort to offer you case management services since you meet the eligibility

requirements to participate in the Bureau of Workers' Compensation's (BWC) vocational rehabilitation program.

{¶ 15} 12. On January 14, 2013, Dr. Altic wrote to relator's counsel:

I last evaluated this gentleman on 11/08/2012 and he had continued unrelenting lumbar axial pain with bilateral lower extremity radicular pain. While there were as many inconsistencies in his FCE as reported, this gentleman was evaluated by vocational rehab and they found him unfeasible and unable to obtain or sustain gainful remunerative employment. I certainly agree with that vocational rehab assessment which is reiteration of my previous statement. While I have indicated some restrictions on a Medco-14, this gentleman is obviously not bedridden and is capable of some degree of function which that Medco-14 reflects. He is simply not capable of any sustained gainful remunerative employment.

Therefore, my opinion that I rendered to you of 11/09/2011 is still valid, that this gentleman is so impaired by his lumbar conditions allowed in this claim which include multilevel disc issues, 722.2 at L2-L3, L3-L4, L5-S1, as well as 722.10 at L4-L5, 722.2 L4-L5, and spondylosis 721.3, that he is so functionally impaired by these conditions and symptomatically impaired, that he is permanently totally disabled from all gainful remunerative employment. In fact, if anything over the past year, his condition has progressed symptomatically.

{¶ 16} 13. On January 16, 2013, relator filed his second application for PTD compensation. In support, relator submitted the January 14, 2013 report from Dr. Altic. Relator also submitted the March 8, 2012 report of Mr. Phillips, the December 19, 2012 closure report signed by Mr. Phillips on December 24, 2012, and Mr. Phillips' December 24, 2012 letter to relator.

{¶ 17} 14. On April 10, 2013, at the commission's request, relator was examined by Brian E. Higgins, D.O. In his four-page narrative report, Dr. Higgins opines:

Mr. Parker is capable of sedentary work. He will require frequent position changes every 10-15 minutes, going from sitting to standing and reverse. He has limited walking abilities. He may walk for about 10-15 minutes at a time. He can exert minimal force up to 10 pounds occasionally with a negligible amount of pushing.

{¶ 18} 15. Dr. Higgins also completed a Physical Strength Rating form. On the form, Dr. Higgins indicated by his mark that relator is capable of sedentary work. In the space provided, under the pre-printed query "[f]urther limitations, if needed," Dr. Higgins wrote in his own hand:

> Change position [every] 10-15 min[utes]. Limited working time.

{¶ 19} 16. Earlier, on October 11, 2012, upon referral of Dr. Altic, relator underwent a functional capacities evaluation ("FCE") performed by Scott Secrest. In his two-page narrative report, Mr. Secrest opined:

> Mr. Parker's abilities and response to testing were very typical of client's [sic] with low back injuries. Although he demonstrates somewhat competitive abilities in isolation, he demonstrates a marked increase in pain behaviors and reported symptoms with cumulative tasks, particularly with sustained sitting or sustained standing.
>
> He demonstrates safe work abilities between the sedentary and light physical demand level. He meets all of the requirements for the sedentary level but meets only partial requirements for the light level (Specific abilities are identified on page 3 of this report). However, even within a sedentary-light capacity, Mr. Parker will most certainly require additional accommodations to allow for regular postural/positional adjustments between sitting, standing, and walking.
>
> Therefore, in my overall analysis, Mr. Parker demonstrates competitive vocational abilities within a Sedentary-Light physical demand level and with regularly scheduled opportunities to make positional adjustments between sitting, standing, and walking.

{¶ 20} 17. Following a June 3, 2013 hearing, an SHO issued an order denying relator's second PTD application. The SHO's order of June 3, 2013 explains:

> The Injured Worker was previously denied permanent total disability benefits by the Indus. Comm. from a hearing on 06/04/2012. The circumstances from the last application for permanent total disability compensation are nearly identical to the present application.

The Injured Worker's last application was supported by Dr. Altic. The current application is supported by Dr. Altic. Dr. Altic in his report of 01/14/2013 in support of the current application references his last report of 11/09/2011 and states the circumstances are still the same, and that his opinion is still the same. Dr. Altic does state in his report of 01/14/2013 that if anything the Injured Worker's condition has progressed since his evaluation of the Injured Worker on 11/09/2011. Dr. Altic's statement regarding a "progression" in the Injured Worker's condition is vague, and provides a modicum of evidence of a deterioration in the Injured Worker's condition since the last determination on this issue from the hearing on 06/04/2012.

Stephen Phillips provided an Employment Assessment report, dated 03/08/2012 on behalf of the Injured Worker, in support of the last application. Stephen Phillips, now on behalf of the Bureau of Workers' Compensation, has provided an employment assessment report related to the Injured Worker['s] new application for Permanent Total Disability. The Staff Hearing Officer in his order of 06/04/2012 referred to Mr. Phillips' 03/08/2012 report and accepted some of his findings, but the Staff Hearing Officer by denying the previous application rejected Mr. Phillips' opinion that the Injured Worker could not return to work.

In light of the fact that both the opinions from Dr. Altic and Mr. Phillips were implicitly rejected by the Staff Hearing Officer in his decision denying permanent total disability at hearing on 06/04/2012, the current reports from Dr. Altic and Mr. Phillips, expressing virtually identical opinions in support of the present application as in the last application for permanent total disability, do not represent credible or persuasive evidence of new and changed circumstances since the previous denial of the Injured Worker's application for permanent total disability compensation.

The only obvious change in the facts since the last application for permanent total disability was denied is that the Injured Worker is one year older.

The Staff Hearing Officer in the order of 06/04/2012 relied upon the 01/12/2012 report from Dr. Stanko. Dr. Stanko at that time found the Injured Worker was limited to sedentary work, with a limitation against more than rare bending and twisting activity. The Injured Worker as regards the present application was examined by Dr. Higgins on 02/04/2013

[sic]. Dr. Higgins states in his report that the Injured Worker retains the capacity to engage in sedentary work with further limitations of needing to change positions frequently and limit his walking to about 10 -- 15 minutes at a time. Dr. Higgins' findings are found compatible with those previously found by Dr. Stanko.

A functional capacity evaluation was performed on the Injured Worker by Scott Secrest on 10/11/2012. Mr. Secrest states the [sic] the Injured Worker met all the requirements for sedentary levels of activity and that he had some capacity to perform light levels of activity. Mr. Secrest concluded, "Therefore, in my overall analysis, Mr. Parker demonstrates competitive vocational abilities within a sedentary-light physical demand level with regularly scheduled opportunities to make positional adjustments between sitting, standing and walking."

Based on the reports from Stanko, Higgins, and Secrest, the Injured Worker is found as related to the allowed conditions in the claim capable of sedentary work.

The disability factors are the same as were presented in the last application except, as previously stated, the Injured Worker is one year older.

The Injured Worker is now 63 years of age. His age is a negative factor, but it would not prevent the Injured Worker from working.

The Injured Worker has a high school education. He reportedly has dyslexia, but this condition has not prevented the Injured Worker from learning new tasks or from performing a multiple of various duties in this job as a carpenter and in building maintenance and repair. The Injured Worker in his 40 year career in building maintenance was responsible for maintaining 8 stores. To understand and maintain this number of buildings, verifies that the Injured Worker is an intelligent and extremely capable individual and able to learn a wide variety of complicated tasks. The Injured Worker stated in his application that his job required him to read work orders, close out work orders, and buy orders and pick up materials. The Injured Worker's past work appears to have required some sedentary work skills.

The Injured Worker because of the work injury is not capable of the hands on type work that he did in the past, but his understanding of operations and building materials would indicate that the Injured Worker could still work in some type of building maintenance as a manger. His capacity to understand building operations would appear to more than compensate for his limitations caused by his dyslexia. In addition, the Injured Worker would appear to be able to work in a sedentary capacity in a retail environment advising customers on the correct materials and tools and requirements needed to complete any home building project.

Unrelated to building maintenance, the Injured Worker would appear to have the ability to monitor security cameras, as long as he had the capacity to change positions on a frequent basis.

Each application for permanent total disability must be evaluated on its own merits, but that does not mean that a final order on the same issue can be disregarded. On virtually the same evidence as is at issue in the present application for permanent total disability, a Staff Hearing Officer on 06/04/2012 found that the Injured Worker was capable of sustained remunerative employment of a sedentary nature. The evidence as regards the present application is virtually the same as that evaluated by the Staff Hearing Officer on 06/04/2012.

{¶ 21} 18. On July 9, 2013, relator, Art Parker, filed this mandamus action.

Conclusions of Law:

{¶ 22} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

{¶ 23} Relator's first application for PTD compensation was denied by an SHO who heard the application on June 4, 2012. Just one year later, on June 3, 2013, another SHO heard relator's second PTD application. It was indeed appropriate for the commission, through its SHO of June 3, 2013, to consider the prior denial of PTD compensation in adjudicating the second PTD application.

{¶ 24} In his June 3, 2013 order, the SHO observed that the circumstances from the "last" application are "nearly identical" to the "present" application.

{¶ 25} Explaining his observation, the SHO of June 3, 2013 began his analysis by comparing the November 9, 2011 report of Dr. Altic submitted by relator in support of his first PTD application with the January 14, 2013 report of Dr. Altic submitted by relator in support of his second PTD application. Noting that Dr. Altic stated in his January 14, 2013 report that "if anything over the past year, his condition has progressed symptomatically," the SHO states that Dr. Altic's statement is "vague, and provides a modicum of evidence of a deterioration in the Injured Worker's condition since the last determination on this issue from the hearing on 06/04/2012."

{¶ 26} Here, relator asserts that Dr. Altic's January 14, 2013 statement regarding the progression of symptoms is not vague, but "in fact it is clear." (Relator's brief, 8.) Relator asserts here that the SHO "knows that this means there is a worsening of symptoms" because the SHO indicated that it provides a modicum of evidence of a deterioration. (Relator's brief, 8.)

{¶ 27} Relator seems to miss the point of the SHO's analysis or comparison of Dr. Altic's reports. In his January 14, 2013 report, Dr. Altic fails to explain how relator's condition has progressed symptomatically. Because Dr. Altic fails to explain the progression of symptoms, the SHO correctly concluded that the statement is vague.

{¶ 28} In any event, the SHO of June 3, 2013 did not rely on Dr. Altic's reports in determining residual functional capacity. Rather, the SHO relied upon the reports of Drs. Stanko and Higgins and the FCE report of Mr. Secrest in determining residual functional capacity. It was within the fact finding discretion of the SHO to reject Dr. Altic's January 14, 2013 report on the basis expressed in the order. While relator disagrees with the SHO's explanation for rejecting Dr. Altic's report, the SHO's explanation resides within the SHO's discretion in determining the weight to be given the evidence before him.

{¶ 29} Relator also argues that the SHO of June 3, 2013 "erred by not considering the newest reports by Dr. Altic and Stephen Phillips." (Relator's brief, at 8.) Relator's argument is undermined by the very argument relator previously submitted regarding Dr. Altic's January 14, 2013 report. As just noted, the SHO addressed Dr. Altic's report, but found it unpersuasive.

{¶ 30} The SHO's order of June 3, 2013 states in part:

> Stephen Phillips provided an Employment Assessment report, dated 03/08/2012 on behalf of the Injured Worker, in support of the last application. Stephen Phillips, now on behalf of the Bureau of Workers' Compensation, has provided an employment assessment report related to the Injured Worker['s] new application for Permanent Total Disability. The Staff Hearing Officer in his order of 06/04/2012 referred to Mr. Phillips' 03/08/2012 report and accepted some of his findings, but the Staff Hearing Officer by denying the previous application rejected Mr. Phillips' opinion that the Injured Worker could not return to work.

> In light of the fact that both the opinions from Dr. Altic and Mr. Phillips were implicitly rejected by the Staff Hearing Officer in his decision denying permanent total disability at hearing on 06/04/2012, the current reports from Dr. Altic and Mr. Phillips, expressing virtually identical opinions in support of the present application as in the last application for permanent total disability, do not represent credible or persuasive evidence of new and changed circumstances since the previous denial of the Injured Worker's application for permanent total disability compensation.

{¶ 31} How can one read the above-quoted portion of the SHO's order of June 3, 2013 and then conclude that the SHO "erred by not considering the newest reports by Dr. Altic and Stephen Phillips"? One cannot. Clearly, the SHO addressed the reports.

{¶ 32} It is clear that the SHO's order of June 3, 2013 rejects Dr. Altic's January 14, 2013 report and it rejects the December 24, 2012 closure report authored and signed by Mr. Phillips. But rejection of those reports is obviously not a failure to consider those reports, as relator here seems to suggest.

{¶ 33} Relator further argues that the SHO's order of June 3, 2013 errs when it finds that the reports of Drs. Stanko and Higgins are compatible. According to relator, Dr. Higgins' report "is much more informative." (Relator's brief, 9.) Clearly, the SHO viewed the reports as being similar as to their opinions on residual functional capacity. That is, both doctors found that relator was capable of sedentary work with specified limitations. Clearly, the SHO did not err when he stated that the reports are "compatible."

{¶ 34} Ohio Adm.Code 4121-3-34(B)(2)(a) states:

"Sedentary work" means exerting up to ten pounds of force occasionally (occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

As earlier noted, in his April 10, 2013 report, Dr. Higgins opines:

Mr. Parker is capable of sedentary work. He will require frequent position changes every 10-15 minutes, going from sitting to standing and reverse. He has limited walking abilities. He may walk for about 10-15 minutes at a time. He can exert minimal force up to 10 pounds occasionally with a negligible amount of pushing.

According to relator:

Dr. Higgins states that Relator can exert "minimal force up to 10 pounds occasionally with a negligible amount of pushing." Sedentary work means being able to exert a negligible amount of force "frequently". Dr. Higgins says Relator cannot. Sedentary work also permits exertion of a negligible amount of force frequently to lift, carry, push or pull or otherwise move objects. Dr. Higgins states Relator can exert only a minimal force up to 10 pounds occasionally with a negligible amount of pushing. The SHO failed to apply Dr. Higgins' findings to [Ohio Adm.Code] 4121-[3]-34(B)(2)(a).

(Relator's brief, 10-11.)

{¶ 35} Contrary to relator's suggestion, Dr. Higgins' statement that relator "can exert minimal force up to 10 pounds occasionally" is not inconsistent with the definition of sedentary work. Dr. Higgins' statement is the equivalent of saying that relator can "exert up to 10 pounds of force occasionally" which is within the definition.

{¶ 36} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE

KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).